**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ABBELLA GROUP HEALTHTECH, LLC d/b/a ABBELLA MEDICAL STAFFING,** | * | |
| *Plaintiff,* | * | |
| v. | * | Civil Case No: 1:24-cv-00331-JMC |
| **QUALIVIS, LLC, et al.,** | | |
| | * | |
| *Defendants.* | | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Abbella Group Healthtech, LLC, doing business as Abbella Medical Staffing ("Abbella"), initiated the present lawsuit on February 1, 2024. (ECF No. 1). The Third Amended Complaint is the operative complaint in this matter, wherein Plaintiff asserts four counts against Defendants Qualivis, LLC, et al. ("Qualivis") and Aya Healthcare, Inc. ("Aya Healthcare"): three breach of contract claims (Counts I, II, and III) and one claim for unjust enrichment (Count IV), stemming from Defendants' alleged failure to pay Plaintiff for providing medical staffing services during the COVID-19 pandemic. (ECF No. 70).[1] Presently pending before the Court is Defendants' jointly filed Motion to Dismiss Plaintiff's Third Amended Complaint, or alternatively, Motion to Stay. (ECF No. 72). The motion has been fully briefed (ECF No. 74; ECF No. 76) and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons set forth herein, Defendants' motion (ECF No. 72) shall be DENIED.

I.      **BACKGROUND**

---

[1] Plaintiff's Second Amended Complaint additionally named Chesapeake Registry Program, Inc. ("CRP") as a Defendant. (ECF No. 49). As will be discussed, for procedural reasons Plaintiff removed CRP as a party in its Third Amended Complaint. (ECF No. 70).

a. <u>Factual Background</u>[2]

i. <u>The Parties</u>

Abbella is a medical staffing agency, based in Baltimore, Maryland, that specializes "in placing travel nurses and other medical health professionals in facilities requiring additional medical staff." (ECF No. 70 at 3).[3]  Chesapeake Registry Program, Incorporated ("CRP"), "is a Maryland corporation created by the Maryland Hospital Association in 2004 to assist hospitals and health systems with staffing through nursing agencies such as Abbella." *Id.* at 2. CRP is no longer a formal party to this action, but is relevant to the factual background in this matter because, as will be discussed, it originally entered into the prime contract with the State of Maryland Department of Health ("MDH"). *Id.* at 2-3. Qualivis and Aya Healthcare are Delaware corporations which contract with the state of Maryland to provide health professional services. *Id.* at 2. Qualivis is a wholly-owned subsidiary of Aya Healthcare, and on March 1, 2021, Qualivis acquired CRP. *Id.* at 4.

ii. <u>Contracts between Qualivis and the State of Maryland</u>

MDH and CRP formed the prime contract (the "MDH Emergency Contract") in this matter on April 30, 2020, under which CRP would provide an online platform for health care providers to request temporary medical staffing from various agencies to cover staffing shortages during the COVID-19 outbreaks. *Id.* at 4. Under the first iteration of the MDH Emergency Contract, CRP was to provide services for eight (8) months, and the total contract amount was $6 million. *Id.* at

---

[2] At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts and construe[s] them in the light most favorable to the plaintiff." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022).
[3] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document. Where a document does not have an electronic filing stamp, the Court is referring to the page numbers at the bottom of the document.

3. The MDH Emergency Contract was thereafter modified by mutual agreement of the parties on July 1, 2020, December 7, 2020, February 8, 2021, and June 21, 2021. *Id.* at 3-4. Each time the prime contract was modified, the parties extended the term of the contract, increased the contract amount, and expanded the scope of the types of staffing provided. *Id.* As noted above, Qualivis acquired CRP on or about March 1, 2021. *Id.* at 4. When the MDH Emergency Contract was modified on June 21, 2021, MDH reported the contract modification to the Maryland Board of Public Works, stating, "[t]his contract was originally awarded to Chesapeake Registry Program, Inc., which was acquired by Qualivis, LLC. Qualivis, LLC has accepted the contract terms via novation agreement." *Id.*

iii.   <u>Written Contracts between Qualivis[4] and Abbella</u>

Four writings set forth the terms of the formal contracts between Abbella and Defendants. *Id.* at 5. Abbella originally entered into a Personnel Agreement with CRP on April 1, 2017, which ran, as amended, until June 30, 2021. *Id.* On or about April 14, 2020, Abbella and CRP entered into a second agreement, titled the Special Emergency Personnel Agreement, with a term running until either Maryland's Governor declared an end to the COVID-19 Emergency Medical Proclamation, or when CRP notified Abbella of termination. *Id.* Per Plaintiff's Third Amended Complaint, when Qualivis acquired CRP in March 2021, Qualivis became Abbella's counterpart under both the Personnel Agreement and the Special Emergency Personnel Agreement. *Id.*

On or about April 16, 2021, Abbella and Qualivis directly entered into a Subcontracting Agreement for Healthcare Professionals (the "Subcontracting Agreement"). The Subcontracting Agreement "set general terms for the parties' dealings," but left material "assignment specific

---

[4] As will be discussed, Aya Healthcare is not a signatory to any of the written contracts with Abbella.

terms," such as facility location, assignment dates, and billing rates, for future agreement. *Id.* The Subcontracting Agreement further provided that "for assignments covered by the Subcontracting Agreement, terms and conditions imposed by Qualivis' clients would be set forth in a '[C]lient [T]erm [S]heet,' which would be binding on Abbella only with its specific agreement." *Id.* In the event of a conflict between the terms of the Subcontracting Agreement and the Client Term Sheet, the Client Term Sheet would control. *Id.* at 6. The parties dispute whether the Subcontracting Agreement required the execution of the Client Term Sheet to make the Subcontracting Agreement effective. *Id.*; ECF No. 72-1 at 8. Qualivis and Abbella did not enter into the Client Term Sheet until March 3, 2022, almost one year after the Subcontract Agreement was signed. *Id.*; ECF No. 73-3 at 3. Thus, Abbella maintains that between April 16, 2021 and March 3, 2022, only the Personnel Agreement and the Emergency Personnel Agreement governed the relationship between Qualivis and Abbella, despite the Subcontracting Agreement having been executed. *Id.*

> iv. <u>The Parties' Implementation of Medical Staffing During the COVID-19 Pandemic</u>

Between March 7, 2021 and June 11, 2022, "assignment specific terms were set forth in email communications between employees of Aya Healthcare and/or Qualivis on one part and Abbella on the other part, requesting a certain number of medical professionals…to go to COVID-19 testing and vaccination sites across Maryland[.]" *Id.* at 6. Aya Healthcare and/or Qualivis would state the number of hours per week for which staffing was required and the hourly pay rate, and Abbella would respond with the names of medical professionals available to work and coordinate their start times and work locations. *Id.* at 6-7. The emails requesting medical staffing were sent by individuals from both Aya Healthcare and Qualivis email addresses. *Id.* In at least one instance, the same individual requesting medical staffing alternated between using Aya Healthcare and Qualivis email accounts on different dates. *Id.* at 8-9.

The parties also utilized two online portal systems to process staffing assignments. *Id.* at 9. When Qualivis acquired CRP in March 2021, the parties continued to use the CRP portal up until May 2022. *Id.* at 9. "During the 2021 time period, the client assignment and worked hours (clock in and outs) were updated on the MDH portal and when the timesheets were received Abbella uploaded them to the Chesapeake Registry portal for Qualivis' review and confirmation." *Id.* Once Qualivis confirmed the timesheets, invoices were generated on the CRP portal. *Id.* In May 2022, after Qualivis and Abbella executed the Client Term Sheet, the CRP portal was replaced by Qualivis' Lotus Connect portal system. *Id.* "Following this change, the bulk of communication requesting Assignment Specific Terms was done in the Lotus system, rather than by email." *Id.* While some sites had longer term staffing needs which could establish staff for a period of several months or more based off of a single email thread, other sites' needs changed weekly. *Id.* As a result, "Abbella personnel were continuously responding to Aya Healthcare and Qualivis's directions to fulfill these changing needs, both by email and using the Chesapeake Registry and Qualivis Portals." *Id.*

Abbella alleges that the individual medical workers, "at Aya Healthcare's direction," designated Aya Healthcare as the agency in the MDH timekeeping system when recording their hours. *Id.* at 10. Based on those timesheets, which Abbella would upload to the CRP and Lotus portals, Aya Healthcare and Qualivis would issue reverse invoices to Abbella for the medical staffing services provided at the various sites. *Id.* "Aya Healthcare and Qualivis did not always promptly, or ever, submit invoices to Abbella." *Id.* Abbella contends that in such circumstances it would follow up to request the invoices be sent, and expended many hours attempting to acquire invoices from Qualivis so as to obtain payment for the staffing services provided. *Id.* Payments were often irregular or delayed, and the final payment from Aya Healthcare or Qualivis was

submitted to Abbella on May 2023. *Id.* at 10-11. Abbella asserts that Aya Healthcare and Qualivis have a balance due of over $5 million, resulting in the case *sub judice. Id.* at 11. Abbella additionally notes in August 2024, after Abbella filed its Second Amended Complaint in this litigation, Qualivis filed an administrative contract claim with the MDH procurement officer and a Complaint with the Maryland State Board of Contract Appeals, asserting entitlement to payment from the State of Maryland for work Abbella and other staffing agencies performed during the COVID-19 pandemic. *Id.* at 12-13.

      b.  <u>Procedural History</u>

Abbella filed its original Complaint in this matter on February 1, 2024, asserting breach of contract and unjust enrichment claims against Qualivis and Aya Healthcare. (ECF No. 1). Qualivis and Aya Healthcare moved to dismiss the original Complaint on April 5, 2024, (ECF No. 18), which was mooted by Abbella subsequently filing an Amended Complaint on April 19, 2024. (ECF No. 25; ECF No. 27). The Amended Complaint added CRP as a party. *Id.* Defendants once again filed a Motion to Dismiss, and on July 11, 2024, this Court issued a memorandum opinion and order granting Defendants' motion ("July 2024 Memorandum Opinion"). *Abbella Grp. Healthtech, LLC v. Qualivis, LLC, et al.*, No. 1:24-cv-00331-JMC, 2024 WL 3377825, at *9 (D. Md. July 11, 2024) ("*Abbella I*"). Specifically, the Court held that Abbella insufficiently alleged breaches of the parties' written contracts and dismissed Abbella's unjust enrichment count to the extent that there existed enforceable contracts regarding its claims, but permitted Abbella leave to amend its complaint once again. *Id.*

On August 22, 2024, Abbella filed its Second Amended Complaint, and Defendants again moved for dismissal. (ECF No. 49; ECF No. 55). Upon reviewing the parties' memoranda regarding Defendants' Motion to Dismiss the Second Amended Complaint, the Court identified a

potential subject-matter jurisdiction issue, as the addition of CRP, a Maryland corporation, destroyed the requisite diversity with Abbella, a Maryland limited liability company. (ECF No. 60). The Court accordingly denied the Motion Dismiss without prejudice and directed the parties to submit supplemental briefing on the issue of subject matter jurisdiction. *Id.* At the request of the parties, the Court held a telephone conference to discuss the situation on March 3, 2025, and the briefing schedule was stayed. (ECF No. 61; ECF No. 62).

Abbella moved for leave to file a Third Amended Complaint on March 31, 2025, seeking to remove CRP as a party to preserve this Court's jurisdiction. (ECF No. 63). After a brief delay, Defendants filed an opposition to Abbella's Motion for Leave to Amend. (ECF No. 67). The undersigned granted Abbella's motion on May 27, 2025, and the Clerk's Office entered Abbella's Third Amended Complaint on the public docket the same day. (ECF No. 69). In the Third Amended Complaint, Abbella asserts four claims against both Defendants: (1) breach of contract, with respect to the Personnel Agreement and the Emergency Personnel Agreement (Count I); 2) breach contract, with respect to the Subcontracting Agreement and the Client Term Sheet (Count II); 3) breach of contract, with respect to contracts formed via the parties' emails and other electronic messages (Count III); and 4) unjust enrichment (Count IV). (ECF No. 70). Qualivis and Aya Healthcare once again filed a Motion to Dismiss, which is presently pending before this Court. (ECF No. 72).

## II.    LEGAL STANDARD

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations

7

omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp. 133, 136 (D. Md. 1995) (internal citations omitted). The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

"If the court considers matters outside of the pleadings on a Rule 12(b)(6) motion, it shall treat the motion as one for summary judgment, to be disposed of under Rule 56, and provide all parties a 'reasonable opportunity to present all material made pertinent to such a motion.'" *Nader v. Blair*, No. WDQ-06-2890, 2007 WL 6062652, at *4 (D. Md. Sept. 27, 2007), *aff'd*, 549 F.3d 953 (4th Cir. 2008) (quoting Fed. R. Civ. P. 12(b)). However, "[u]nder limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider exhibits, without converting the motion to dismiss to one for summary judgment." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019). "Those limited circumstances are matters of public record, documents explicitly incorporated into a complaint by reference or attached to the complaint as exhibits, or any document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the

document's authenticity." *Shields v. Verizon Md., LLC*, No. 1:23-CV-02932-JMC, 2024 WL 1050996, at *4 (D. Md. Mar. 11, 2024) (quotation omitted). "A document is integral to the complaint if its very existence, and not the mere information it contains, gives rise to the legal rights asserted." *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021), *aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022), *and aff'd*, No. 21-2432, 2022 WL 17985700 (4th Cir. Dec. 29, 2022) (quotation omitted).

Defendants attach copies of all four relevant contracts to their Motion to Dismiss. (ECF Nos. 73-1; ECF No. 73-2; ECF No. 73-3; ECF No. 73-4).[5] Because Plaintiff relies on the contracts in bringing this lawsuit and references them consistently throughout its Third Amended Complaint, the Court deems those contracts to be part of Plaintiff's pleadings and will resolve Defendants' motion with reference to those contracts without converting the motion into one for summary judgment.  *See, e.g.*, *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 984 n.1 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004); *NAC Consulting, LLC v. 3Advance, LLC*, 650 F. Supp. 3d 441, 446 (E.D. Va. 2023) ("[A] court can properly consider a contract in evaluating a motion to dismiss a contract dispute."). The Court will additionally consider the documents attached to Plaintiff's Second[6] and Third Amended Complaints, which include email communications which potentially establish a contractual obligation under Count III, Abbella's summary detailing the outstanding balance allegedly owed for providing medical staff to Qualivis and/or Aya, and Qualivis' Complaint filed in the Maryland State Board of Contract Appeals action, together with

---

[5] This Court granted Defendants' unopposed Motion to Seal the exhibits attached to the Motion to Dismiss on June 25, 2025. (ECF No. 75).

[6] Consideration of the exhibits attached to Abbella's Second Amended Complaint is appropriate, despite it no longer being the operative complaint, because the Local Rules provide that "only newly added exhibits are to be attached to an amended pleading." Loc. R. 103.6(b) (D. Md. 2025).

exhibits Qualivis attached to its Complaint documenting shifts for which it seeks payment from the Maryland Department of Health. (ECF No. 49; ECF No. 70).[7]

## III.    ANALYSIS

### a.    Maryland Substantive Law Governs this Diversity Matter

In diversity actions such as this one, this Court applies the substantive law of the "forum state, including its choice of law rules." *Bank of La. v. Marriott Int'l, Inc.*, 438 F. Supp. 3d 433, 441-42 (D. Md. 2020). Thus, because this Court sits in the District of Maryland, Maryland choice of law rules shall control. Maryland state courts have long recognized the common law doctrine of *lex loci contractus*, under which, "when determining the construction, validity, enforceability, or interpretation of a contract, we apply the law of the jurisdiction where the contract was made." *Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015) (collecting cases). However, if the contract at issue contains a choice of law provision, the law of the specified jurisdiction is generally applied. *Id.* (citing *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 659 A.2d 1295, 1301 (Md. 1995)).

Abbella urges the Court to apply substantive Maryland law, as three of the four written agreements contain a choice of law clause providing that they shall be governed by Maryland law. (ECF No. 73-1 at 48; ECF No. 73-2 at 10; ECF No. 73-4 at 17). Although the Subcontracting Agreement contains a choice of law provision designating substantive California law, (ECF No. 73-3 at 11), Abbella accurately notes that the Client Term Sheet incorporates the Subcontracting Agreement and includes a clause stating that "[i]n the event there is a conflict between the terms and conditions of the [Subcontracting Agreement] or any other Exhibits thereto, and this Term Sheet and its Exhibits, this Term Sheet and its Exhibits shall control[.]" (ECF No. 73-4 at 2).

---

[7] The Court resolves Defendants' Motion to Dismiss without treating the contents of the MDH litigation documents as judicial admissions, and accordingly will not address Defendants' argument regarding any judicial admissions being barred by the parole evidence rule. (ECF No. 72-1 at 23; ECF No. 74 at 28).

Defendants appear to agree that Maryland law should be applied and also point out that the Client Term Sheet controls in the event of a conflict with the Subcontracting agreement, although they do cite several California contract cases. (ECF No. 72-1 at 15 n.2; ECF No. 76 at 3). Given that the Client Term Sheet prevails in the event of a conflict with the terms of the Subcontracting Agreement, and the Client Term Sheet provides that Maryland law shall govern, the Court will apply substantive Maryland law in evaluating the sufficiency of Counts I and II, which pertain to the parties' written agreements.

The parties do not address choice of law with respect to Counts III and IV (breach of contract based on the parties' correspondence, and unjust enrichment), which are not related to the written agreements and therefore cannot be resolved solely based on the choice of law provisions set forth in those agreements. The Court will accordingly apply substantive Maryland law in evaluating Counts III and IV as well. *See Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 782 (4th Cir. 2023) (quoting *Echo, Inc. v. Whitson Co.*, 52 F.3d 702, 707 (7th Cir. 1995)) ("Where neither party argues that forum state's choice of law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.").

    b.  <u>Counts I and II: Breach of Contract (Written Agreements)</u>

        i.  <u>Abbella states viable breach of contract claims against Qualivis under the Personnel Agreement, the Special Emergency Personnel Agreement, the Subcontracting Agreement, and the Client Term Sheet.</u>

Defendants first contend that Counts I and II allege only threadbare allegations that any of the contracts were breached, are facially deficient, and should therefore be dismissed under Federal Rule 12(b)(6). (ECF No. 72-1 at 13-15). Defendants further aver that Abbella fails to state the terms of any of the contracts which were purportedly breached, and instead merely concludes that Defendants established a contractual obligation, and breached that obligation by failing to render

payment to Abbella under the agreements. *Id.* Abbella responds that it has alleged detailed facts "that go far above the minimum required to adequately plead a claim for breach of contract." (ECF No. 74 at 9). The Court agrees.

As explained in this Court's July 2024 Memorandum Opinion, "under Maryland law, there is no mandatory requirement that a plaintiff plead the specific contract provision" at issue to survive a motion to dismiss. *Jolly v. Nationwide Agribusiness Ins. Co.*, No. CV ELH-16-00038, 2016 WL 1377400, at *5 (D. Md. Apr. 6, 2016) ("[C]ourts in this District have not required plaintiffs to cite precise contractual provisions to sustain a claim for breach of contract under Maryland law"). Rather, Maryland's highest court has consistently held that "in order to state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant." *Id.* (citing *RRC Ne., LLC v. BAA Md., Inc.*, 994 A.2d 430, 442 (Md. 2010)). However, it is also "well-established in Maryland that a complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *RRC Ne., LLC*, 994 A.2d at 440 (quoting *Cont'l Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 369 A.2d 566, 569 (Md. 1977)) (emphasis in original).

In its July 2024 Memorandum Opinion, the undersigned determined that Abbella's Amended Complaint lacked clear details regarding which contracts were breached and essentially alleged a beginning (that a valid contract existed) and an end (that Defendants owed Abbella over $5 million), but included no middle—when or how Defendants breached the contracts. *Abbella I*, 2024 WL 3377825 at *5. Abbella has remedied these deficiencies in its Third Amended

Complaint.[8] With respect to Count I, Abbella alleges that under the Personnel Agreement and the Emergency Personnel Agreement, which it entered into originally with CRP, the parties agreed that CRP would contract with "selected nursing and allied health agencies [] to provide Participating Institutions with healthcare staff for per diem assignments and travel assignment[s] during the COVID-19 pandemic." (ECF No. 70 at 16). Abbella further explains that after Qualivis acquired CRP in March 2021, Qualivis became Abbella's counterpart under the agreements via novation and both parties continued to perform under the agreements through March 3, 2022. *Id.* at 17. Next, Abbella states that, pursuant to the terms of the Personnel Agreement and the Emergency Personnel Agreement, Defendants "set forth specific contractual obligations to staff sites" and "Abbella fulfilled its contractual obligations as evidenced by its workers showing up to administer services at the prescribed sites." *Id.* Finally, Abbella alleges that Defendants breached their contractual obligations by failing to render payment to Abbella for the services it provided under the contracts, and attaches a detailed and extensive summary exhibit documenting the instances in which it provided staffing services but did not receive payment. (ECF No. 49-13).

As for Count II, Abbella contends that under the Subcontracting Agreement and Client Term Sheet, which became effective on or about March 3, 2022, Qualivis was obligated to pay for medical staffing services provided by Abbella as well as to reimburse Abbella for certain expenses incurred. (ECF No. 70 at 18). Abbella again alleges Qualivis breached its contractual obligations by failing to render payment for staffing services it provided under the agreements. *Id.* Moreover,

---

[8] Defendants argue that Abbella has failed to state any viable claims "for the *fourth time*." (ECF No. 72-1 at 5) (emphasis in original); *see also id.* at 10 ("On March 31, 2025, Abbella took its *fourth* bite at the apple when it moved for leave to file a Third Amended Complaint.") (emphasis in original). While Defendants are technically correct that the operative complaint is the fourth complaint filed by Abbella, this characterization overlooks the fact that Abbella amended its original Complaint as of right under Federal Rule of Civil Procedure 15(a)(1)(B), and filed its Third Amended Complaint to remedy a potential jurisdictional defect identified by the Court, as well as to add new facts occurring after the Second Amended Complaint was filed. (ECF No. 25; ECF No. 63). The present memorandum opinion is only the second time which this Court has addressed the sufficiency of Abbella's claims.

the same summary exhibit referenced with respect to Count I, (ECF No. 49-13), also includes staffing services which Abbella alleges constitute breaches of the Subcontracting Agreement and Client Term Sheet (i.e., for staffing services occurring after March 3, 2022, when the Subcontracting Agreement and Client Term Sheet became effective).

In the Court's July 2025 Memorandum Opinion, the undersigned determined that Abbella's First Amended Complaint was deficient because Abbella "state[d] that ''assignment specific terms' were established between the parties" and alleged a breach of those assignment specific terms, but "provide[d] no indication of those terms, when those terms were established, or most notably, when or how those terms were breached." *Abbella I*, 2024 WL 3377825 at *4. The 44-page summary exhibit provided by Abbella more than adequately addresses these details: for each staffing position filled for which it alleges nonpayment, Abbella indicates the relevant staffing site, dates worked, invoice date, balance, and citations to the specific communications setting forth the assignment specific terms. (ECF No. 49-13). Admittedly, the parties' method of establishing assignment specific terms via email and portal communications means that there will eventually be disputes over which communications set assignment specific terms under the parties' written contracts, versus those that could have formed entirely new contracts, or could arguably allow for recovery under a theory of unjust enrichment. This will likely be an arduous task given the apparently voluminous party communications over the course of several years, and more factual development via the discovery process is likely necessary for the parties to draw such lines. However, in the meantime, the Court is satisfied that Abbella has alleged facts demonstrating a contractual obligation owed by Qualivis to pay Abbella in exchange for staffing medical sites under the four written agreements, and a breach of those obligations by Qualivis' failure to pay for Abbella's staffing services. *RRC Ne., LLC*, 413 Md. at 655; *Final Analysis Comm'n Servs. Inc.*

14

*v. Gen. Dynamics Corp.*, 253 F. App'x 307, 315 n.6 (4th Cir. 2007) (quoting *Fromm Sales Co. v. Troy Sunshade Co.*, 159 A.2d 860, 863 (Md. 1960)) ("A failure to make payment under a contract 'indisputably constitutes a material breach[.]'").[9] Defendant's Motion to Dismiss as to Counts I and II, with respect to Qualivis, shall be permitted to proceed.

ii.   <u>Abbella adequately states a breach of contract claim against Aya Healthcare under Counts I and II.</u>

Defendants next contend that Counts I and II must be dismissed as to Aya Healthcare because it is not a party to or identified in any of the written contracts, and therefore owes no contractual obligations to Abbella under the agreements. (ECF No. 72-1 at 14-15). Abbella counters that Aya may be held liable under the written contracts because either (1) Qualivis is a wholly owned subsidiary of Aya Healthcare; and/or (2) Aya was directly involved with the performance of the written contracts. (ECF No. 74 at 17-18). Abbella acknowledges that the question of whether Aya Healthcare's involvement should render them directly liable or liable as an agent for Qualivis is yet to be determined, but argues that "with Qualivis still denying responsibility under the written agreements, Abbella is entitled to plead in the alternative[.]" *Id.* at 18. Thus, Abbella argues, the theory of Aya Healthcare's liability under the written contracts should be determined at a later juncture, and its breach of contract claims should be permitted to proceed against both parties. *Id.*

Under Maryland law, it is generally the rule that "a contract cannot be enforced by or against a person who is not a party to it." *Cecelia Schwaber Trust Two v. Hartford Accident and Indem. Co.*, 437 F. Supp. 2d 485, 489 (D. Md. 2006) (quoting *Crane Ice Cream Co. v. Terminal*

---

[9] The original quote from *Fromm Sales* reads that a failure to make payment "indubitably constitutes a material breach" rather than "*indisputably* constitutes a material breach," as is stated in *Final Analysis Communication Services*. *Fromm Sales*, 159 A.2d at 863; *Final Analysis Commc'n Servs.*, 253 F. App'x at 315 n.6. In any event, the meaning of the quotation is not altered.

*Freezing & Heating Co.*, 128 A. 280, 281 (Md. 1925)); *see also Allegis Grp. Inc. v. Bero*, 689 F. Supp. 3d 81, 116-17 (D. Md. 2023) (quoting *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 728 A.3d 783, 794 (Md. Ct. Spec. App. 1999) (explaining, under Maryland law, "a person cannot be held liable under a contract to which he was not a party."). However, a person may become liable under a contract if they later accept or adopt it. *Residential Warranty Corp.*, 728 A.2d at 316 (citing *Snider Bros., Inc. v. Heft*, 317 A.2d 848, 851 (Md. 1974)). Acceptance may be express, *see Snider Bros.*, 417 A.2d at 851 (concluding defendant adopted or assented to contract, where she agreed in a later contract to be bound by the earlier contract if payments were not made), or where a party engages in in conduct sufficient to manifest acceptance of the contract. *See Porter v. Gen. Boiler Casing Co., Inc.*, 396 A.2d 1090, 1095 (Md. 1979) (holding that a non-party may become bound by a written contract where their conduct is sufficient to manifest acceptance); *see also Kurland v. ACE Am. Ins. Co.*, No. JKB-15-2668, 2017 WL 354254, at *2 (D. Md. Jan. 23, 2017) (quoting *Porter*, 396 A.2d at 1095) ("A non-party may become bound by a contract if that party's conduct is 'sufficient to manifest acceptance of the terms of a written contract.'").

Here, Abbella alleges that Aya Healthcare performed under all four written contracts by making staffing arrangements under the agreements through individuals communicating via Aya Healthcare email accounts, and by providing payment directly to Abbella for staffing services. (ECF No. 70 at 10). Construing the facts in the light most favorable to Abbella, as the Court is bound to do when evaluating a Motion to Dismiss, such conduct could potentially be viewed as manifesting acceptance of the terms of the contracts. *Compare Dev. Design Grp., Inc. v. Deller*, No. CCB-10-53, 2012 WL 1098603, at *29 (D. Md. Mar. 30, 2012) ("Under certain circumstances, payment of contract bills might support a denial of summary judgment on a claim of non-party

contract acceptance.").[10] It could very well be the case, as more evidence come to light through discovery, that Aya Healthcare may not be held liable under the written agreements. However, at this early stage in the litigation, the Court determines that Abbella has sufficiently plead that Aya Healthcare manifested acceptance of the written agreements through its actions. For the reasons already set forth above with respect to Qualivis, *see supra* Sec. III(b)(i), the Court also holds that Abbella has adequately plead facts demonstrating a breach of Aya Healthcare's obligations under the contracts. Defendants' motion to dismiss will accordingly be denied as to Counts I and II.

    c.  <u>Count III: Breach of Contract (Emails and Communications Through the Chesapeake Registry and Qualivis Online Portals)</u>

Defendants next move to dismiss Count III of the Third Amended Complaint, Abbella's breach of contract claim premised on the formation of independent contracts through the parties' electronic communications. (ECF No. 72-1 at 17). Defendants articulate three arguments for dismissal: (1) Count III is unnecessary because Defendants "have never argued that the [formal] contracts are not valid and do not apply"; (2) the claim is facially deficient due to its threadbare allegations with respect to communications sent via the CRP and Qualivis portals; and (3) Abbella cannot plausibly allege the existence of contracts formed through the parties' email communications because Abbella does not plead facts demonstrating an offer or consideration. *Id.* at 17-18. The Court will address each in turn.

As for Defendants' first argument, the undersigned is not persuaded that Count III is unnecessary. While it is true that Defendants do not contend that the formal contracts are invalid, they do argue that Aya Healthcare is not bound by the contracts and thus has no obligation to pay

---

[10] The Court previously dismissed Abbella's breach of contract claim against Aya Healthcare because Abbella pleaded no facts to support the notion that Aya Healthcare was a party to the written contracts. *Abbella I*, 2024 WL 3377825 at *5. In its Third Amended Complaint, Abbella provides further factual context which permits the Court to conclude otherwise.

for the staffing services which Abbella alleges Aya Healthcare requested, and Abbella supplied. With respect to Qualivis, the Court views Count III as an alternate theory of relief: in the event that is later determined that certain staffing services provided by Abbella which the parties established via email or portal messaging are not within the scope of the written agreements, Abbella may argue that those particular messages formed an independent contractual obligation. Of course, Abbella cannot ultimately recover under both theories with respect to the same staffing transactions.[11] Abbella is, however, entitled to plead in the alternative in the meantime. *See* Fed. R. Civ. P. 8(a)(3) ("[A] demand for the relief sought…may include relief in the alternative or different types of relief.").

Defendants next aver that Count III is facially deficient because Abbella pleads only threadbare allegations demonstrating that any contractual obligations were formed through the parties' communications sent through the CRP and Qualivis portals. (ECF No. 72-1 at 17-18). Defendants point out that Abbella attaches multiple email chains arranging for staffing services to its complaints, but does not provide any correspondence sent via the portals, and further fails to identify provisions of the emails which were purportedly breached. *Id.* In response, Abbella directs the Court's attention to the summary exhibit referenced above, which sets forth specific communications (including portal messages) establishing staffing services for which Abbella alleges it is due payment. (ECF No. 74 at 22). The summary exhibit indicates the dates of work, invoice date, balance owed, and citations to the specific party communications—with the corresponding bates number—which Abbella states are already in Defendants' possession. *Id.*; ECF No. 49-13. Defendants appear to overlook the summary exhibit in making their arguments.

---

[11] Abbella concedes this point in its Third Amended Complaint and explicitly pleads Count III in the alternative: "In the alternative, and to the extent that Defendants may contend that the formal contracts set forth in Counts I and II do not apply…." (ECF No. 70 at 19).

Moreover, at the pleading stage, Abbella is not required to provide detailed factual allegations of its claims, and must simply "provide the grounds of [its] entitlement to relief[.]" *Petry*, 597 F. Supp. 2d at 561–62 (quoting *Twombly*, 550 U.S. at 545). The Court therefore concludes that by incorporating the summary exhibit into its pleadings, Abbella has given more-than adequate notice of its claims to Defendants. Abbella certainly need not attach every portal communication and/or email that could form the basis of its claims to its complaint under the Federal pleading standard.

Further, and as already noted, Abbella is not required to cite to a specific provision in the emails which was purportedly breached. *Jolly*, 2016 WL 1377400 at *5 ("[C]ourts in this District have not required plaintiffs to cite precise contractual provisions to sustain a claim for breach of contract under Maryland law"). Abbella alleges that the parties' portal communications established a contractual obligation whereby Defendants would pay for staffing services provided by Abbella, and that "Qualivis and Aya Healthcare breached the [p]arties' agreement by failing to make full and timely payment for services performed and expenses incurred by Abbella." (ECF No. 70 at 19-20). This, in conjunction with the summary exhibit, adequately states a breach of contract claim under Maryland law. *Jolly*, 2016 WL 1377400 at *5 (citing *RRC Ne.*, 994 A.2d at 442) ("[I]n order to state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant.").

The Court will briefly address Defendants' final argument for dismissal of Count III. Defendants contend that Abbella fails to state a breach of contract claim because it does not allege that the email communications demonstrate an offer made *to Abbella* to pay for its staffing of medical professionals, suggesting instead that the emails could be offers made to the individual medical professionals who personally staffed the sites. (ECF No. 72-1 at 18-19). Defendants

additionally maintain that Abbella does not allege the contractual prerequisite of consideration. *Id.* at 19. Abbella responds that these arguments overlook the parties' course of dealings and Defendants' own business model, explaining:

> Abbella, the medical staffing agency, secured individual professionals to fill the positions offered by Defendants, and caused the individual service providers to perform services at Defendants' direction.
>
> …
>
> As Abbella alleges, Defendants paid Abbella according to this system, using the staffing needs and dates agreed in emails such as these, the time cards submitted through their portals, and reverse invoices for amounts due according to the email agreements concerning the individual healthcare providers. Defendants know this, because each of CRP, Aya Healthcare, and Qualivis (not the State or any other entity) did in fact pay Abbella (and not the individual providers) for its services according to this process.

ECF No. 74 at 23-24 (internal citations omitted). The Court agrees.[12] The emails attached to Abbella's Second Amended Complaint are directed to Abbella's employees, and, per the allegations in the Third Amended Complaint, reflect the parties' typical practice of arranging the details of staffing services for which Abbella would ultimately collect payment. *See, e.g.,* (ECF No. 49-4; 49-5; 49-6). Dismissal on this basis is not therefore not appropriate.

The Court also declines to dismiss Count III for failure to allege consideration. Defendants provide little argument on this issue, beyond simply stating in its Motion to Dismiss that "Abbella also fails to allege, let alone demonstrate, the other prerequisite of consideration[,]" and does not address the matter further in its Reply brief. (ECF No. 72-1 at 19). "'To be binding and enforceable, contracts ordinarily require consideration' which, in Maryland, 'may be established by showing a benefit to the promisor or a detriment to the promisee.'" *Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 455 (D. Md. 2020) (quoting *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d

---

[12] The court declines to determine at this juncture whether the communications referenced constitute offers, as Defendants appear to primarily argue that the emails are not offers directed *to Abbella*.

656, 661 (Md. 2003)). Abbella sufficiently pleads facts demonstrating consideration by alleging that it provided staffing services to Defendants as requested via Defendants' emails, an act which is undoubtedly beneficial to Defendants. (ECF No. 70 at 19) ("[T]hroughout the parties' relationship, Aya Healthcare and Qualivis would correspond with Abbella to provide contractual offers by email and through the [CRP] and Qualivis Portal...Abbella accepted the contractual offers by providing services at the agreed upon price[.]").[13] Accordingly, Defendants' Motion to Dismiss as to Count III shall be denied.

> d. Count IV: Unjust Enrichment

Finally, Defendants move to dismiss Abbella's unjust enrichment claim on the grounds that (1) the dispute is governed by the parties' formal contracts and there can be no recovery under a quasi-contract theory where express contracts exist;[14] and (2) Abbella is required to allege fraud or bad faith in the formation of the express contracts to state a claim for unjust enrichment, and fails to do so. (ECF No. 72-1 at 21). The undersigned will begin by addressing Defendants' first argument. Defendants are correct that "no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests..." *Cnty. Comm'rs v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607 (Md. 2000) (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984)).

---

[13] There could perhaps be an argument, which Defendants do not make, that supplying staffing services could not constitute consideration because Abbella was already bound to do so under the written agreements. However, because the Court views Count III as an alternative claim for relief and has already clarified that Abbella could not obtain relief under both theories for the same transactions, dismissal remains unwarranted.

[14] Defendants specifically point to the fact that Abbella incorporates by reference allegations concerning the express contracts into its unjust enrichment claim as evidence that "Abbella has pleaded itself out of an unjust enrichment claim." (ECF No. 72-1 at 20). The Court does not view this common pleading practice as necessitating dismissal, where, as here, a party pleads an unjust enrichment claim as an alternate theory of relief. *See Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 597–98 (D. Md. 2019) (quoting *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013)) ("Notably, 'a plaintiff is not barred from pleading [quasi-contractual] theories in the alternative where the existence of a contract concerning the subject matter is in dispute.'").

However, although Abbella "may not recover under both contract and quasi-contract theories, it is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute." *Swedish Civ. Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002). As explained with respect to Count III, recovery under a theory of unjust enrichment may be possible if the services for which Abbella seeks payment are determined to be outside the scope of the parties' written agreements, or if Aya Healthcare cannot be held liable under the express contracts—i.e., if the theories of recovery concern different subject matters. *Id.* The Court is therefore not persuaded that the existence of the formal contracts necessitates dismissal of Count IV at this time.

Defendants cite two cases for the proposition that where a plaintiff pleads claims for breach of contract and unjust enrichment in the alternative, they must allege fraud or bad faith in the formation of the express contract. (ECF No. 72-1 at 21-22) (first quoting *J.E. Dunn Constr. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F. Supp. 3d 593, 608 (D. Md. 2015), then citing *Jones v. Pohanka Auto N., Inc.*, 43 F. Supp. 3d 554, 573 (D. Md. 2014)). This rule, while not inaccurate, is also not complete.[15] *J.E. Dunn Construction Company* and *Jones* both ultimately[16] rely upon *County Commissioners of Caroline County v. J. Roland Dashiell & Sons*, a case in which Maryland's Court of Appeals explained that while it is generally settled that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract, courts will permit "unjust enrichment claims only when there is evidence of fraud or bad faith, there has been

---

[15] Neither *Jones* nor *J.E. Dunn Construction Company* involved the possibility that relief sought was outside the bounds of the express contract, which likely accounts for the opinions referring to only the part of the rule relevant to the issues at hand. *See, e.g., Jones*, 115 F. Supp. 3d at 608 ("It is uncontroverted that the Subcontract governs the terms, scope, and compensation (and all other aspects) surrounding the relationships between [the parties].").

[16] To be precise, *Jones* expressly relies upon *J. Roland Dashiell & Sons.* 43 F. Supp. 3d at 573. *J.E. Dunn Construction Company* cites to *Jones* and *Kwang Dong Pharmaceutical Company v. Han*, which in turn also relies on *J. Roland Dashiell & Sons. J.E. Dunn. Constr. Co.*, 115 F. Supp. 3d at 608; *Kwang Dong Pharm. Co. v. Han*, 205 F. Supp. 2d 489, 497 (D. Md. 2002).

a breach of contract or a mutual recission of the contract, when recission is warranted, *or when the express contract does not fully address a subject matter.*" 747 A.2d at 609 (emphasis added) (footnotes omitted). As has already been explained, Abbella pleads its unjust enrichment claim as an alternate theory of recovery, applicable in the event that the Court later concludes that certain staffing services are outside the scope of the parties' formal contracts. Abbella is consequently not additionally required to allege fraud or bad faith in the formation of the parties' contracts. *S100, Inc. v. Odili*, No. TDC-22-0411, 2022 WL 5247569, at *8 (D. Md. Oct. 6, 2022) (quoting *J. Roland Dashiell & Sons*, 747 A.2d at 609) ("Contrary to [defendant's] claim, there is no requirement of fraud or bad faith relating to the contract in order for an unjust enrichment claim to proceed 'when the express contract does not fully address' the relevant subject matter."). Defendants' Motion to Dismiss as to Count IV will be denied.

   e.  <u>Defendants' Motion to Stay</u>

   Defendants alternatively ask that this proceeding be stayed pending the outcome of the MDH litigation. (ECF No. 72-1 at 23). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 379 (4th Cir. 2013) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)) (internal quotation marks omitted). Courts considering a motion to stay weigh three factors:

> (1) the impact on the orderly course of justice, sometimes referred to as judicial economy, measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected from a stay; (2) the hardship to the moving party if the case is not stayed; and (3) the potential damage or prejudice to the non-moving party if a stay is granted.

*Trice v. Oliveri & Assocs., LLC*, No. GLR-19-3272, 2020 WL 13042297, at *2 (D. Md. Dec. 18, 2020) (quoting *Int'l Refugee Assistance Project, LLC v. Trump*, 323 F. Supp. 3d 726, 731 (D. Md.

2018)). The determination "calls for an exercise of judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *Bethel Ministries, Inc. v. Salmon*, No. SAG-19-01853, 2020 WL 1873623, at *2 (D. Md. Apr. 15, 2020) (quoting *United States v. Georgia Pac. Corp.*, 562 F.2d 294, 296 (4th Cir. 1977)). Courts additionally consider the length of the requested stay, as well as "whether proceedings in another matter involve similar issues." *Id.* (first quoting *Stone v. Trump*, 402 F. Supp. 3d 153, 160 (D. Md. 2019); then quoting *Popoola v. MD-Individual Prac. Ass'n*, No. 2000-2946, 2001 WL 579774, at *2 (D. Md. May 23, 2001)). "Importantly, [t]he party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Id.* (quoting *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983)).

Defendants argue that all factors weigh in favor of staying this action in its entirety. (ECF No. 72-1 at 24). They maintain that any stay would be finite, lasting only as long as the MDH litigation, and argue they will be prejudiced by proceeding with this litigation before the resolution of the MDH case, "as that litigation could 'settle questions of fact' pertinent to this litigation…and thus potentially limit (or eliminate) additional motion practice and discovery in the present action." *Id.*[17] Defendants further aver that Abbella will not suffer any substantial harm if a stay is granted, and state that a stay will "conserve valuable judicial resources and simplify and clarify the issues before this Court" because of the possibility that MDH may be responsible for making payments to Abbella, or had to approve Abbella's services before Qualivis was required to make payments to Abbella. *Id.* at 24.

Abbella responds that it will be substantially prejudiced by a stay in this matter as it has carried a multi-million dollar receivable from Defendants for several years. (ECF No. 74 at 30).

---

[17] This argument is somewhat at odds with Defendants' earlier contention that "[t]here are no allegations in the MDH litigation regarding the terms of the contracts at issue in the present action[.]" (ECF No. 72-1 at 23).

Abbella additionally contends that Qualivis and MDH have agreed to indefinitely suspend the MDH proceedings, and the stay sought in this matter is thus guaranteed to be lengthy. *Id.* Further, Abbella notes that the two cases have distinct legal issues, and argues that regardless of whether the State owes Qualivis payment, Qualivis remains contractually liable to Abbella. *Id.*

Considering the factors of judicial economy, hardship to Defendants, and potential prejudice to Abbella, the Court declines to stay the case at this time. The Court is particularly cognizant of potential prejudice to Abbella's claim should the case be stayed for the pendency of the MDH litigation. Abbella filed this lawsuit in February 2024, and the parties have yet to begin the discovery process. (ECF No. 1). It is unknown at this stage how long the MDH litigation will take to reach a resolution, and as time progresses it is more likely that witness memories will fade, or relevant documentary evidence may be lost. *See Stone*, 402 F. Supp. at 161 (considering the reasonableness of the length of the stay requested and the fact that discovery would be further delayed in denying motion to continue stay); *Gibbs v. Plain Green LLC*, 331 F. Supp. 3d 518, 527 (E.D. Va. 2018) ("A non-moving party can suffer prejudice when a stay is reasonably expected to cause a significant delay in proceedings."). Moreover, Abbella alleges that it is owed over $5.2 million, which is unquestionably a significant receivable for any company to have outstanding. Although Defendants allege that they will face hardship if the instant matter is allowed to proceed, they provide few specifics beyond generally claiming that the MDH litigation could limit motions practice and/or discovery in this case. And while Defendants raise the possibility that MDH may be responsible for payment directly to Abbella and/or that MDH is required to approve Abbella's services before Qualivis could be obligated to submit payment to Abbella under the contracts, Defendants make no such arguments in their current Motion to Dismiss. (ECF No. 72-1 at 24). Accordingly, the Court will deny Defendants' Motion to Stay. Defendants may of course file

another motion to stay prior to the dispositive motions deadline, should they deem it appropriate to do so.

## IV.    CONCLUSION

For the reasons stated, it is this 22nd day of August, 2025, by the United States District Court for the District of Maryland, hereby ordered:

1) Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint, or alternatively, Motion to Stay, (ECF No. 72), is DENIED; and

2) Defendants shall file an Answer to the Third Amended Complaint within twenty-one (21) days of the entry of this Order.

SO ORDERED.

Dated: August 22, 2025                                    /s/
                                        _____
                                        J. Mark Coulson
                                        United States Magistrate Judge